UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TALARICO YOUNG,

                Petitioner,

     v.

STEWART ECKERT, Superintendent of
Wende Correctional Facility,

                Respondent.

9:19-CV-1243
(TJM)

---

APPEARANCES:                                    OF COUNSEL:

TALARICO YOUNG
Petitioner, pro se
14-B-1425
Wende Correctional Facility
P.O. Box 1187

HON. LETITIA JAMES                              JODI A. DANZIG, ESQ.
Attorney for Respondent                         Ass't Attorney General
New York State Attorney General
28 Liberty Street
New York, NY 10005

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

Petitioner Talarico Young seeks federal habeas corpus relief pursuant to 28 U.S.C. §

2254.  Dkt. No. 1, Petition ("Pet.").[1]  Respondent has opposed the Petition and filed pertinent

records from the state court proceedings.  Dkt. No. 15, Memorandum of Law in Opposition

("Resp. Mem."); Dkt. No. 16 ("Answer"); Dkt. No. 17-1, State Court Record ("SR"); Dkt. Nos.

---

[1] Citations to the Petition herein refer to the page number generated by the Court's electronic filing system, CM/ECF.

18-1, 18-2, Pretrial Transcripts ("PT");[2] Dkt. Nos. 18-3, 18-4, 18-5, 18-6, 18-7, Trial Transcripts ("T.");[3] Dkt. No. 18-8, Sentencing Transcript ("S.").[4]  Petitioner has also filed a reply.  Dkt. No. 24, Traverse.

For the reasons that follow, the Petition is denied and dismissed.

## II.   RELEVANT BACKGROUND

On or about May 9, 2013, Petitioner was arrested by the Syracuse Police Department and charged with Second Degree Murder (New York Penal Law ("Penal Law") § 125.25(1)) for allegedly causing the death of Johanna Pagan earlier that day.  SR 0004.  On June 6, 2013, after waiving immunity, Petitioner testified before the grand jury.  SR 0044, 0046, 0048-74.  Petitioner appeared before the grand jury in shackles.  SR 0044, 0046, 0116.

In July, 2013, Petitioner was indicted by the grand jury for the crimes of Murder in the Second Degree and Perjury in the First Degree (Penal Law § 210.15).  SR 0335-336.  The murder charge arose from an accusation that Petitioner stabbed Johanna Pagan multiple times, including three times in the heart, resulting in her death.  *Id*.  The perjury charge arose from an accusation that Petitioner offered false testimony to the grand jury that Pagan was already dead when he arrived at the apartment where she died.  *Id*.

Following the indictment, Petitioner moved for an order suppressing statements made by him to the police on the grounds that such statements were obtained involuntarily within

---

[2]  The cited page numbers for the pretrial transcripts refer to the page numbers located at the top right corner of each page.

[3]  The cited page numbers for the trial transcripts refer to the page numbers located at the top right corner of each page.

[4]  The cited page numbers for the sentencing transcript refers to the page numbers located at the top right corner of each page.

the meaning of Criminal Procedure Law § 60.45.  SR 0323-324.  Petitioner also moved for an

order suppressing identification evidence on the grounds that the show-up procedures were

tainted and unduly suggestive.  *Id*.  On November 20 and November 26, 2013, the trial court

held a combined *Wade/Huntley* hearing.[5]  SR 0323-333.

Following the hearing, the trial court denied Petitioner's request to suppress

identification evidence, and granted in part and denied in part Petitioner's request to

suppress statements made by him to the police on May 9, 2013.  SR 0330-333.  Specifically,

the trial court granted the motion with respect to statements that occurred "at approximately"

6:38 p.m., when Petitioner invoked his right to counsel, and denied the motion with respect to

all statements made before this time.  *Id*.

Petitioner proceeded to trial on March 31, 2014.  T. 1, 20.  During the voir dire of the

first panel of prospective jurors, the prosecutor exercised peremptory challenges against

jurors four and six.  T. 121.  With respect to the challenge against juror number four, defense

counsel made a *Batson* motion.[6]  T. 122-23.

In response to defense counsel's *Batson* motion, the trial court asked the prosecutor

for a race-neutral explanation for the challenge to juror number four, who was the only

African-American prospective juror on the panel.  T. 124.  The prosecutor responded that he

had no obligation to provide an explanation because defense counsel failed to make a prima

---

[5] "In *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179, 183 (1965), the New York Court of Appeals held that a trial court must find the voluntariness of a defendant's statement beyond a reasonable doubt before it can be submitted to a jury, and that the burden of showing voluntariness is on the People.  A *Wade* hearing, named after *United States v. Wade*, 388 U.S. 218, 232, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), is held to determine if a witness's identification is tainted by unduly suggestive identification procedures." *Black v. Rock*, 103 F. Supp. 3d 305, 311 (E.D.N.Y. 2015) (citing *Maldonado v. Burge*, 697 F.Supp.2d 516, 521, 529-31 (S.D.N.Y. 2010)).

[6] *Batson v. Kentucky*, 476 U.S. 79 (1986).

3

facie showing of purposeful discrimination.  T. 124-25.  The prosecutor then explained that he removed juror number four because her background in early childhood education indicated that she "want[ed] to see the best in everyone and ha[d] a difficult time judging people."  T. 125.  The trial court denied the *Batson* motion, finding that defense counsel failed to make the requisite prima facie showing.  *Id*.

Following voir dire, the prosecutor and defense counsel gave opening statements. During the prosecutor's opening statement, he referenced Petitioner's statement to law enforcement officials when he was initially taken into custody that they would have to "prove it," i.e., prove that he stabbed Ms. Pagan.  T. 252-53, 258.

After opening statements, the prosecutor called the following witnesses, among others: (1) an eleven-year-old referred to herein as Z.F.; (2) Z.F.'s neighbor, John Phillips; (3) Syracuse Firefighter Christopher Birmingham; (4) Joseph Inzalaco, an employee of The Art Store on Erie Boulevard; (5) Onondaga County Medical Examiner Deborah Johnson; (6) Daniel Cowen, a scientist at the Onondaga County Center for Forensic Sciences; and (7) George Washington, an inmate who was incarcerated at the Onondaga County Justice Center with Petitioner following his arrest.  T. 272-343, 434-66, 496-544.

Z.F. and John Phillips each testified that on May 9, 2013, they were outside talking to each other on Gertrude Street between 3:30 and 4:00 p.m. when they witnessed a person each later identified as Petitioner run past them and away from an area where Z.F. heard the sound of broken glass.  T. 273-80, 284, 295, 301-04, 307-309.  They both further testified that after Petitioner ran past, they heard Ms. Pagan call out of a window for help, and indicate that she had been stabbed.  T. 276-77, 280, 289-90, 304, 307-08.  Z.F. also testified that he noticed Petitioner's hand was tucked under his shirt and something that resembled "a

4

pair of socks balled up" was hanging from his back, left pocket as he ran past.  T. 277-79, 291.

Christopher Birmingham testified that at around 3:45 p.m. on May 9, 2013, he was dispatched to 121 Gertrude Street in response to a stabbing.  T. 327-28.  Birmingham further testified that a few blocks from the house, he saw a tall, black male wearing a long-sleeved black shirt run past his vehicle and up North Crouse Street.  T. 329-31.  Birmingham also testified that after he arrived at the scene, he went to The Art Store and was shown a shirt, which was "the same type of shirt that [he] had seen on the person that [he] . . . saw running."  T. 334-35.

Joseph Inzalaco, an employee of The Art Store on Erie Boulevard, testified that on May 9, 2013, just before 4:00 p.m., he noticed Petitioner "parading" up and down the aisles of the store, continually looking out the store's windows, and acting in a suspicious manner. T. 337-41, 349.  Inzalaco spoke with Petitioner, who was wearing a white t-shirt and carrying a dark-colored sweater under his arm, and provided directions to the store to a person on Petitioner's phone.  T. 339-42.   Inzalaco then walked outside after seeing "all kinds of squad cars going by" and approached two police officers who were behind the store.  *Id*.  Inzalaco asked the officers if they were looking for a tall, dark-skinned man, and when they said that they were, he told them the man was inside the store.  T. 340-42.   The officers then went into the store, saw Petitioner, who was no longer holding the dark-colored sweater, and placed him in handcuffs.  T. 341-342.  Thereafter, under a rack inside the store, the police found a dark sweater that Inzalaco indicated did not belong to the store.  T. 342-43.

Onondaga County Medical Examiner Deborah Johnson testified that she went to the crime scene on May 9, 2013, and saw bloody footprints and "a lot of blood" on the floor of

the apartment.  T. 501.  Johnson found Pagan lying on her back with her feet angled toward an open window that was covered with blood, and pronounced her dead.  T.503-05.  At the autopsy the following morning, Johnson determined that Pagan suffered eight distinct stab wounds and five superficial cuts.  T. 506-07.

Daniel Cowen, a scientist at the Onondaga County Center for Forensic Sciences, testified that he analyzed the sneakers and long-sleeved shirt that Petitioner was wearing on May 9, 2013, and that one sneaker and the shirt tested positive for the presence of blood.  T. 526-34, 536-37.  Cowen further testified that the DNA profiles obtained from the blood stains on the sneaker and the long-sleeved shirt matched the DNA profile obtained from Johanna Pagan.  T. 533-34, 536-37.

George Washington testified that on May 12, 2013, he spoke to Petitioner while the two were incarcerated at the Onondaga County Justice Center.  T. 436-39, 443-44. Washington testified that an inmate introduced him to Petitioner because the inmate believed Washington could help Petitioner with his case.  *Id*.  Washington further testified that Petitioner initially told him that the people accusing Petitioner of killing Pagan were "crazy," but after Washington said he did not believe Petitioner's story, Petitioner admitted to stabbing Pagan because she would not pay him for drugs he provided to her.  T. 438-39, 444-49.

The following day, Washington told Petitioner that he would have to admit he was at the apartment on Gertrude Street around the time that Pagan was stabbed because too many people saw him running away.  T. 449-50.  Washington advised Petitioner to say that Pagan was already dead when he got to the apartment, and that he panicked and ran away. T. 450.  Sometime later, Washington decided that Petitioner did not deserve his assistance and contacted the District Attorney's Office with the information Petitioner gave him.  T.

451-52.

In addition to the prosecution's witness testimony, Petitioner's grand jury testimony was read into the record at trial.  T. 468-496.  Petitioner presented no witnesses on his behalf.  T. 551-561.

After defense counsel rested and moved for a trial order of dismissal on both charges, which was denied, the trial court issued pre-summation instructions to the jury.  T. 561-65. The prosecutor and defense counsel then made closing statements.  T. 561-639.

At the start of the prosecutor's summation, he made the following comment: "Did [defense counsel] offer an explanation for why Johanna Pagan's blood is on the back of the elbow of the shirt that [Petitioner] stashed at The Art Store?"  T. 606.  Immediately, defense counsel objected, and the trial court instructed the jury as follows: "[T]he defendant does not have a burden of proof in this case. I will remind you of that fact, and also remind you what the lawyers have said and will say during their closing arguments are not evidence. You have heard the evidence."  T. 606-07.

The prosecutor then continued with his summation, which included the following remarks:

> Her blood is on the back of the elbow of the shirt that he stashed at The Art Store. There is no innocent explanation for that. [Defense counsel] also proposed a series of questions about why would somebody who had just committed a heinous crime run down the middle of the street. Why wouldn't they hide in the yards. Why would somebody -- just why wouldn't they drop the glove, right? Why would he keep that glove in his pocket at The Art Store if he had just committed this heinous crime. Well, the assumption is that people who end up in criminal trouble are smart enough to get out of it. Right? They make completely rationale decisions so they wouldn't make mistakes. If they were really smart, they wouldn't be here. People make mistakes in the middle of horrific mistakes. They don't always make logical decisions. Probably would have been better for the defendant to run through the backyards or hide under a porch

7

> somewhere. He didn't do that. So he was caught and now he is here. He's here on two charges.
>
> . . .
>
> I saw this very cute chart [defense counsel] put together, and my immediate thought as he was going through it was this is why people hate lawyers, right? . . . . Take your definitions about the law from Judge Miller, not this stupid chart.

T. 607-09.

Following the prosecutor's summation, the trial court gave its final charge to the jury, during which the court stated as follows, among other things:

> The accused is not required to prove that he is not guilty. In fact, the accused is not required to prove or disprove anything. To the contrary, the People have the burden of proving the accused guilty beyond a reasonable doubt. That means before you can find the accused guilty of a crime, the People must prove beyond a reasonable doubt every element of the crime, including that the accused is the person who committed that crime. The burden of proof never shifts from the People to the accused.

T. 649.

On April 4, 2014, the jury convicted Petitioner of Murder in the Second Degree and Perjury in the First Degree.  T. 711-13.  On April 29, 2014, the trial court sentenced Petitioner to an indeterminate prison term of twenty-five years to life for murder and a consecutive indeterminate prison term of two and one-third to seven years for perjury.  S. 15.

On January 31, 2016, Petitioner filed a motion to vacate the judgment of conviction pursuant to Criminal Procedure Law ("CPL") § 440.10 ("440 Motion").  SR 0001-0160.  In his motion, Petitioner contended, among other things, that (1) he was denied the effective assistance of counsel because his attorney failed to conduct an investigation and contact potentially exculpatory witnesses, SR 0124, 0159, and (2) the prosecutor introduced perjured testimony at trial, SR 0139.  The People opposed the motion, *see* SR 0161, and Petitioner

filed a reply, SR 0173.

On April 27, 2016, the trial court denied the 440 Motion without a hearing.  SR 0185-191.  The court rejected Petitioner's ineffective-assistance claim as "unsubstantiated and without merit[,]" noting that the record showed that counsel was thoroughly familiar with the facts of the case, made appropriate motions throughout the proceedings, and vigorously cross-examined the People's witnesses.  SR 0188-91.  The trial court further ruled that Petitioner provided no support for his claim that the prosecutor knowingly presented false testimony at trial.  SR 0191.

Petitioner sought leave to appeal to the Appellate Division.  SR 0192.  The People opposed his application, and Petitioner filed a reply.  SR 0238-41.  On October 24, 2016, the Appellate Division denied leave.  SR 0242.  Petitioner sought to reargue his leave application, SR 0244, and the Appellate Division denied that request.  SR 0265.

Petitioner also pursued a direct appeal and, in a counseled brief to the Appellate Division, Fourth Department, argued, among things, as follows: (1) he was denied the effective assistance of counsel because his attorney failed to object to him being visibly shackled during the grand jury proceeding and insufficiently cross-examined the People's DNA expert at trial; (2) the prosecutor made improper remarks during his opening statement and summation and violated the trial court's suppression order; and (3) the trial court erred in denying Petitioner's *Batson* motion.  SR 0281-90, 0296-301, 0309-10.

On September 29, 2017, the Appellate Division unanimously affirmed Petitioner's judgment.  *People v. Young*, 153 A.D.3d 1618, 1621 (4th Dep't 2017).  In so doing, the Appellate Division rejected Petitioner's argument that the trial court should have suppressed all of his statements to the police, and not just a portion thereof, and found that the trial court

"properly determined that [Petitioner] did not make at any time an unequivocal request for the assistance of an attorney during the interrogation . . . [and] did not invoke his right to remain silent until approximately 6:38 p.m., and all statements thereafter were suppressed." *Young*, 153 A.D.3d at 1619.  The Appellate Division further concluded that any error regarding the admission of the statements was harmless because "[t]he evidence of [Petitioner's] guilt is overwhelming, and there is no reasonable possibility that any error in admitting . . . [the] statements contributed to his conviction . . . ." *Id.*

The Appellate Division separately found that the trial court "properly denied [Petitioner's] *Batson* challenge" because Petitioner "failed to meet his burden of making out a prima facie case of 'purposeful discrimination with respect to the prosecutor's exercise of a peremptory challenge to a black prospective juror' inasmuch as he failed to articulate 'any facts or circumstances that would raise an inference that the prosecutor excused the prospective juror for an impermissible reason[.]'" *Young*, 153 A.D.3d at 1620 (quoting *People v. Bryant*, 12 A.D.3d 1077, 1079, *lv. denied* 4 N.Y.3d 761).

With respect to Petitioner's contention that he was denied a fair trial by several instances of alleged prosecutorial misconduct, the Appellate Division noted as follows:

> [Petitioner] objected to only two instances of alleged misconduct, thereby rendering the remaining instances unpreserved for our review . . . . We note that, in any event, none of the unpreserved instances constitutes misconduct. Specifically, . . . the prosecutor did not engage in misconduct during his opening remarks, and he did not violate the court's suppression ruling. In addition, all of the unpreserved instances of alleged misconduct during summation were either fair comment on the evidence or fair response to defense counsel's summation . . . . Turning to the two preserved instances of alleged misconduct, we agree with [Petitioner] that a comment by the prosecutor during summation constituted impermissible burden-shifting . . . . The court, however, instructed the jury after [Petitioner's] objection that [he] did not have the burden of proof, and that instruction alleviated any prejudice to [Petitioner] . . . . We further agree

10

> with [Petitioner] that the prosecutor improperly denigrated the defense and
> defense counsel during summation . . . ., but . . . such misconduct was not
> so pervasive or egregious as to deny [Petitioner] a fair trial . . . .

*Young*, 153 A.D.3d at 1620.

Lastly, the Appellate Division rejected Petitioner's ineffective assistance of counsel argument, noting that "[d]efense counsel objected to the two instances of prosecutorial misconduct during summation[,]" and Petitioner "was not denied effective assistance of counsel by counsel's alleged failure to object to the [other instances of] claimed misconduct[,]" or "by counsel's alleged failure to object to the use of restraints on [Petitioner] while he testified before the grand jury." *Young*, 153 A.D.3d at 1620-21.

Petitioner filed a counseled leave application in the New York Court of Appeals, which the People opposed. SR 0449, 0457. On December 13, 2017, the Court of Appeals denied leave. SR 0458-59. Petitioner then moved for reconsideration, which was denied on June 20, 2018. SR 0460, 0470, 0473.

Petitioner also petitioned the U.S. Supreme Court for a writ of certiorari, which was denied on October 1, 2018. SR 0474.

## III.  THE PETITION, RESPONSE, AND REPLY

In his Petition, Petitioner argues that he is entitled to federal habeas relief on the following grounds: (1) he received ineffective assistance of trial counsel (Ground One); (2) the prosecutor engaged in misconduct (Ground Two); and (3) the trial court improperly denied defense counsel's *Batson* motion (Ground Three). Pet. at 5, 7-8, 16-35.

Respondent argues that the Petition should be dismissed because (1) Petitioner's ineffective assistance of counsel claim is meritless, (2) Petitioner's prosecutorial misconduct

claim is partially procedurally barred and entirely meritless, and (3) Petitioner's *Batson* claim is meritless.  Resp. Mem. at 10-28.

In his Reply, Petitioner offers additional arguments in support of his *Batson* claim and certain aspects of his ineffective assistance of trial counsel claim.  *See generally*, Traverse.

## IV.   DISCUSSION

### A.   Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §§2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'"  *Nevada v. Jackson*, 569 U.S. 505, 508-509 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Metrish v.*

*Lancaster*, 569 U.S. 351, 358 ( 2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "'clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

**B.     Ground One - Ineffective Assistance of Trial Counsel Claim**

Petitioner argues that trial counsel was ineffective for failing to do the following: (1) contact potential exculpatory witnesses and investigate evidence of "third party culpability"; (2) conduct meaningful cross-examination of the People's DNA evidence and "expose false testimony that was material to the case"; and (3) meaningfully object to Petitioner being shackled during his grand jury testimony.  Pet. at 5, 16-33.

Respondent argues that Petitioner's ineffective assistance of counsel claims are wholly meritless.  R. Mem. at 10-18.  The Court agrees.

**1. Legal Standard**

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different such that the petitioner suffered prejudice.  *Premo v. Moore*, 562 U.S. 115, 121-22 (2011) (noting that petitioner "must show both deficient performance by counsel and prejudice") (citation and internal quotation marks omitted); *Strickland v. Washington*, 466 U.S. 668, 694 (1984.  The standard "must be applied with scrupulous care" in habeas proceedings because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial] proceedings[.]"  *Premo*, 562 U.S. at 122.  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks and further citation omitted).  To establish a deficient performance by counsel, a petitioner must overcome "a strong presumption that counsel's conduct falls within

14

the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Demonstrating constitutionally ineffective assistance of counsel is "never an easy task . . . [and] establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Premo*, 562 U.S. at 122 (citations and internal quotation marks omitted); *Burt v. Titlow*, 571 U.S. 12, 19 (2013) (noting that "AEDPA erects a formidable barrier" to federal habeas review of claims that have been adjudicated in state court). When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105. Instead, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### 2. Analysis

Here, trial counsel provided Petitioner with an effective defense overall. Counsel made an omnibus pretrial motion in which he sought dismissal of the indictment and preclusion of certain evidence, and succeeded in suppressing a portion of Petitioner's police interview on May 9, 2013. SR 0323-34; SR 0338-57. At trial, counsel conducted vigorous

cross-examination of the People's witnesses, made several objections to testimony offered by the People, and moved for a trial order of dismissal at the close of the People's case and at the conclusion of evidence.  *See, e.g.*, T. 282-89, 425-26, 452-60, 551, 561.  As the Supreme Court has noted, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," as it does here.  *Richter*, 562 U.S. at 111.

Thus, whether Petitioner's ineffective assistance claims are considered individually or in combination, Petitioner has failed to establish trial counsel's representation was deficient or that he was prejudiced.  As a result, the state courts' rejection of Petitioner's ineffective assistance claims was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor did it constitute an unreasonable determination of the facts in light of the evidence presented.  Accordingly, and for the reasons discussed more fully below, Petitioner's ineffective assistance claims are denied.

### a.  Defense Witnesses

As noted, Petitioner contends that trial counsel was ineffective for not contacting potential exculpatory witnesses and pursuing a defense of third-party guilt.  Pet. at 5, 20-26. According to Petitioner, trial counsel could have pursed this defense through the following witnesses: (1) Pagan's neighbor Maryanne Dunnigan, who provided statements to police following Pagan's murder that (i) another person told her that a six-foot-tall black male with braids had slept on Pagan's couch the night before her murder, and was seen arguing with Pagan on the day of the murder at around 3:10 p.m.,[7] and (ii) Pagan did not have a boyfriend

---

[7]  At the time of his arrest, Petitioner had short hair.  SR 0097.

and preferred to have relationships with women; (2) Pagan's neighbor Rupert Dawson, who provided statements to police that he saw a man walking around in Pagan's yard at approximately 3:00 p.m. wearing a dark hooded sweatshirt with the hood up, and was unable to identify Petitioner as the person he saw at Pagan's building on the day of the stabbing at a show-up procedure; (3) Merrie Pagano, a resident of the neighborhood, who provided a statement to the police that she saw a man standing in the middle of Gertrude Street near the building where Pagan was murdered approximately ten minutes before police arrived on the scene, and was also unable to identify Petitioner as the person she saw standing in the street at a show-up procedure; (4) Kathleen Blake, a resident of 121 Gertrude Street, who provided a statement to police that she heard people working in the apartment building before she left at approximately 3:00 p.m. on the day of the murder; and (5) Laura A. Walker, a certified SABIS Latent Examiner from the Syracuse Police Department, who prepared a "latent examination report" of the murder scene, and lifted multiple prints that did not match Petitioner, including a print from a person who previously worked at the apartment who was never questioned and prints from individuals who could not be identified.  Pet. at 20-26; *see also* SR 0076-88.

As an initial matter, many of the aforementioned statements would have had little, if any, probative value with respect to a defense of third-party guilt.  For example,  the proposed testimony by Dunnigan about what she heard on the street would not have been helpful to Petitioner because (1) Pagan was not murdered at her home, and (2) the murder occurred almost one hour after Pagan was claimed to be involved in an argument with a

male who had braided hair.[8]  Similarly, Blake's statement to police that she heard more than one person working in the apartment where Pagan was working at some point before 3:00 p.m. would not have been helpful to Petitioner because (1) Blake did not identify who was working in the apartment, and thus could not exclude Petitioner's presence, and (2) what she heard took place roughly one hour or more before Pagan was murdered.

In addition, Mary Gilson, the property manager of 121 Gertrude Street, testified that she contracted with a property maintenance company to replace carpeting and paint the apartment where Pagan was murdered, and that this company finished working in the unit a day or two before she hired Pagan to clean the apartment.  T. 373-77.  In light of this testimony, Walker's "latent examination report" of the murder scene , which revealed the presence of multiple prints that did not match Petitioner, also would have had little to no probative value.

Thus, trial counsel was not ineffective under *Strickland* for failing to pursue the aforementioned testimony.  *See Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) ("The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." (internal quotation marks and citation omitted)); *United States v. Luciano*, 158 F.3d 655, 660-62 (2d Cir. 1998) (to show prejudice from the failure of counsel to call witnesses, petitioner must show that the uncalled witnesses would have provided relevant testimony); *Williams v. Phillips*, 297 Fed. App'x 56, 58-59 (2d Cir. 2008) (counsel not ineffective for failing to prepare alibi witness where witness "did not account for [petitioner's] whereabouts during the entire time period in question"); *Castellano v. United*

---

[8]  The proposed testimony by Dunnigan about what she heard another person say also would have been inadmissible hearsay.  *See, e.g., Morales v. Portuondo*, 154 F. Supp. 2d 706, 723 (S.D.N.Y. 2001) (defining hearsay); *People v. Nieves*, 67 N.Y.2d 125, 131 (N.Y. 1986) (citation omitted).

*States*, 795 F. Supp. 2d 272, 278-79 (S.D.N.Y. 2011) ("Emille Castellanos's testimony regarding Castellano's whereabouts on the afternoon and evening of May 1, 2001, would not have been probative of Castellano's involvement in Ferreira's murder because Ferreira was murdered before 11:10 a.m. on that date. As a result, Maffeo was not ineffective for failing to present Emille Castellanos's testimony."); *Buitrago v. Scully*, 705 F. Supp. 952, 954 (S.D.N.Y.1989) (counsel not ineffective for failing to present alibi witness where petitioner fails to show witness knew where petitioner was at the time of the crime).

Furthermore, some of the proposed testimony might have harmed Petitioner's case. For example, Dunnigan's statement to police regarding what she knew about Pagan would have confirmed that Pagan used drugs with men, without eliminating the possibility that Pagan had relationships with men. *See* SR 0086.[9] Thus, her potential testimony could have bolstered, instead of discredited, the testimony of George Washington.

Similarly, with respect to Pagano and Dawson – Pagan's two neighbors who might have testified that they were unable to identify Petitioner as the person they observed near the murder scene around the time it occurred – it is entirely possible that these individuals may have testified that Petitioner resembled the person they observed in the area. Indeed, at the show-up procedure, Pagano stated that the man she saw shortly before the murder was wearing the same clothing as, and had similar facial features to, Petitioner. SR 0086. In addition, Dawson told police at the show-up procedure that Petitioner resembled the man he saw at approximately 3:00 p.m. in Pagan's yard, but that he could not be sure if it was the same person because the man in Pagan's yard had the hood of his sweatshirt over his head.

---

[9] Dunnigan did not tell police that Pagan never had relationships with men, and she confirmed that Pagan used drugs with men. *See* SR 0086.

SR 0083.

In light of the foregoing, trial counsel's failure to pursue the aforementioned witnesses and statements was clearly a matter of trial strategy, which cannot be second-guessed at this stage as unreasonable.  *See Strickland*, 466 U.S. at 691 (holding that when there is "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable"); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied*, 538 U.S. 1021 (2003).

Lastly, it bears emphasizing that the evidence of Petitioner's guilt was overwhelming. First, Petitioner's own grand jury testimony placed him at the crime scene near the time of the stabbing.  Indeed, Petitioner testified that he ran from the scene upon discovering Pagan dead.  T. 473-75.  In addition, two eye-witnesses testified that Petitioner fled the crime scene after the victim was stabbed and before she died, the victim's DNA was discovered on blood stains found on Petitioner's clothing, and Petitioner made a jailhouse confession to Mr. Washington.  Thus, calling the aforementioned witnesses also would not have changed the result of the proceedings in any respect.

Petitioner's ineffective assistance claim on this basis is therefore denied and dismissed.

### b.  Cross-Examination

Petitioner argues that trial counsel failed to conduct a "meaningful" cross-examination of Z.F., George Washington, and Daniel Cowen.  Pet. at 5, 26-31.

20

### (i)  Z.F.

Petitioner contends that on the day of the murder, Z.F. identified him as the person Z.F. saw run from 121 Gertrude Street shortly after hearing glass break and Pagan's calls for help, based on an item of material Z.F. saw protruding from Petitioner's back pocket.  Pet. at 27-28.  Petitioner contends that trial counsel improperly failed to question Z.F. about why he described this item to police officers on the day of the murder as something "brown/tanish," but testified at trial that he thought the item was a pair of balled up socks, which is how the item was described by one of the police officers on the scene.  *Id*. at 28-29.  Petitioner further contends that the discrepancy suggests that Z.F. was coached on what to say, which counsel should have explored.  *Id*.

Contrary to Petitioner's argument, trial counsel did in fact explore the issue of whether Z.F. had been coached on how to testify.  First, trial counsel questioned Z.F. about whether he spoke with the prosecutor prior to testifying, and got him to admit that (1) the prosecutor told him the types of questions he would be asked, and (2) he and the prosecutor discussed the answers he would provide.  T. 282-83.  Then, later during cross-examination, trial counsel asked Z.F. whether "somebody" told him what to say to the jury.  T. 285.  Even though Z.F.'s response was "[n]o," trial counsel pushed the issue further after Z.F. testified as to the time he arrived home from school on the day of the murder, asking him whether "somebody" went over specific times that events occurred to make sure he had it correct.  *Id*.  Although Z.F. responded in the negative, trial counsel probed the issue of potential coaching for a third time by asking Z.F. if he was wearing a watch in response to his testimony that he spoke with Phillips for three to four minutes before hearing glass break.  T. 288-89.

In light of the aforementioned testimony, and particularly Z.F.'s testimony that nobody

told him what to say to the jury, there would have been little, if any, potential benefit to questioning Z.F. about the minor discrepancy Petitioner identifies, and doing so may have served to inflame one or more jurors, particularly in light of Z.F.'s age, and the absence of a logical reason for him to be untruthful.  Thus, trial counsel's failure to cross-examine Z.F. regarding the discrepancy between his statement to the police and his trial testimony related to the item he saw in Petitioner's back pocket does not render trial counsel's cross-examination objectively unreasonable.  *See, e.g., Jackson v. Lee*, 10-CV-3062, 2010 WL 4628013, at *42 (S.D.N.Y. Nov. 16, 2010) (given extent of other cross-examination of witness, "trial counsel's failure to question [the witness] on [a] minor point was not unreasonable nor ineffective conduct" (citing, *inter alia*, *Lavayen v. Duncan*, 311 Fed. App'x 468, 471 (2d Cir. Feb. 24, 2009)), *report and recommendation adopted by* 2010 WL 5094415 (S.D.N.Y. Dec. 10, 2010); *Duell v. Chappius*, No. 9:17-CV-00341 (JKS), 2018 WL 4938563, at *5 (N.D.N.Y. Oct. 11, 2018) ("Witness cross-examination is generally viewed as a matter of trial strategy; accordingly, it is virtually unchallengeable 'unless there is no . . . tactical justification for the course taken.'" (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998)).[10]

Petitioner's ineffective assistance claim on this basis is therefore denied and dismissed.

### (ii)  George Washington

Petitioner argues that trial counsel improperly failed to challenge George Washington

---

[10] Although Petitioner states that Z.F.'s testimony about hearing glass break and then seeing Petitioner run past him was "critical" because it placed Petitioner at the scene of the apartment immediately before Pagan died, *see* Pet. 27-29, there was also testimony from Phillips that Pagan was alive after he saw Petitioner run past him outside.  T. 302-05.

on two issues.  First, Washington's testimony that Petitioner stated during one of their conversations that he had sexual intercourse with Pagan, which is inconsistent with the statement Maryanne Dunnigan made to police on the day of the murder – which was not introduced at trial – that Pagan preferred to have relationships with women.  Pet. at 29-30. Second, Washington's testimony that Petitioner stated during one of their conversations that he began having feelings for Pagan, used drugs with her on the day of the murder, and then "went out on the block to make more sales to get more money[,]" which differed from Washington's grand jury testimony insofar as that testimony did not indicate where Petitioner went after having sexual intercourse with Pagan on the day of the murder, before he went to the apartment where she was murdered.  *Id*.

As an initial matter, trial counsel questioned Washington about lying, and got him to admit that he had lied to prosecutors and the police on occasions prior to the day of his testimony.  T. 452-53.  Trial counsel also asked Washington questions about his efforts to offer testimony against Petitioner in exchange for a plea deal for himself and his girlfriend, introduced a letter Washington sent to the District Attorney's Office in this regard, and accused Washington of lying to the jury about why he agreed to testify against Petitioner.  T. 453-57.  In addition, trial counsel highlighted Washington's criminal history to further attack his credibility.  T. 459-60.

Although Petitioner takes issue with trial counsel's failure to question Washington about a potential discrepancy between his grand jury testimony and his testimony on direct examination at trial, as well as his testimony about the nature of Petitioner's relationship with the victim, probing these issues would have invited re-direct examination that further highlighted the scope of Washington's knowledge about the crime scene and events in the

23

moments immediately preceding and following Pagan's murder, which could only have come from Petitioner.

Simply put, there was certainly a tactical justification for counsel not cross-examining Washington on the subjects about which Petitioner takes issue, and instead attacking Washington's credibility more broadly.  Furthermore, trial counsel's cross-examination of Washington was not objectively unreasonable.

Petitioner's ineffective assistance claim on this basis is therefore denied and dismissed.

### (iii)  Daniel Cowen

Petitioner contends that trial counsel improperly failed to cross-examine Daniel Cowen on his testimony that three DNA contributors were obtained from Petitioner's sneaker and long-sleeved shirt, with Pagan's DNA being "the major contributor."  Pet. at 30.  According to Petitioner, trial counsel should have probed Mr. Cowen regarding how he concluded that Pagan's DNA was "the major contributor," the basis for his use of the word "major[,]" and whether the victim's DNA could have been transferred to Petitioner's sneaker and shirt during an encounter before the date and time of the murder.  *Id.*

To be clear, Cowen testified on direct examination that he obtained DNA profiles from blood stains on Petitioner's left sneaker and long-sleeved shirt, and that the "major component" of those profiles matched the DNA profile of the victim.  T. 531-33.  Cowen further testified that the probability of an unrelated individual having a matching profile was less than one in 9.66 quadrillion.  T. 533.

On cross-examination, trial counsel questioned Cowen about a variety of subjects, including the procedure he used to perform the DNA analyses, and the fiber and hair

24

analyses that he performed on items at the crime scene.  T. 535-41.  Counsel established

that (1) only a droplet of blood was present on Petitioner's left sneaker, (2) no blood was

found on Petitioner's pants, t-shirt, or right sneaker, (3) it is possible for a person to transfer

DNA from the surface of one object to the surface of another, (4) Cowen did not test

Petitioner's DNA, (5) Cowen did not know how the blood stains arrived on the sneaker and

long-sleeved shirt that contained Pagan's DNA profile, and (6) Cowen could not determine

whether Petitioner was the owner of the sweatshirt found at the crime scene.  T.535-41,

543-44.

Trial counsel was not required to challenge every statement made by Mr. Cohen on

direct examination in order to be considered effective in his representation of Petitioner.

*See, e.g., Felder v. United States*, No. 20-CV-7531, 2021 WL 3537164, at *3 (S.D.N.Y. Aug.

10, 2021) ("[D]ecisions about whether to engage in cross-examination, as well as the scope

of cross-examination, are 'strategic in nature and generally will not support an ineffective

assistance claim.'" (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)).  Moreover,

the testimony elicited by trial counsel on cross-examination supported the overall defense

theory that Petitioner could not be guilty of murder because no significant amount of Pagan's

blood was found on his clothing, and nobody witnessed Petitioner stab Pagan, which trial

counsel highlighted during summation.  *See* T. 585-86, 593-94.

In light of the foregoing, trial counsel's cross-examination of Daniel Cowen certainly

satisfies an objective standard of professional reasonableness.  Furthermore, as noted

above, in light of the overwhelming evidence of Petitioner's guilt unrelated to Mr. Cowen's

DNA testimony, potentially yielding an admission from Mr. Cowen that Pagan's DNA could

have been transferred to Petitioner's sneaker and shirt during an encounter before the date

and time of the murder would not have changed the result of the proceedings in any respect.

Petitioner's ineffective assistance claim on this basis is therefore denied and dismissed.

### c. Shackling During Grand Jury testimony

Petitioner contends that counsel was ineffective for (1) allowing him to testify before the grand jury in shackles, and (2) not objecting to the shackling after the conclusion of the grand jury proceeding.  Pet. at 31-33.[11]

As an initial matter, "[i]t is well-settled that a claim involving an error in a grand jury proceeding is not cognizable upon federal habeas review" because "[t]here is no federal constitutional right to a grand jury" and "any defect in the grand jury proceeding is cured by [a] petitioner's subsequent conviction."  *Zimmerman v. Superintendent Conway*, No. 10-CV-1393, 2013 WL 12379648, at *23 (S.D.N.Y. May 7, 2013) (rejecting argument that trial court erred when it failed to dismiss the indictment on the ground that the petitioner was presented to the grand jury in shackles and surrounded by corrections officers) (internal quotation marks and citations omitted), *report and recommendation adopted sub nom. Zimmerman v. Conway*, 2018 WL 6413144 (S.D.N.Y. Dec. 6, 2018); *see also Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court."); *Davis v. Mantello*, 42 Fed. App'x 488, 490-91 (2d Cir. 2002) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court." (citing

---

[11] Donald Kelly, Esq. represented Petitioner following his arraignment, and during the grand jury proceeding. SR 0005-0006, 0044, 0046.  Following the grand jury proceeding, through trial, Petitioner was represented by Paul Carey, Esq.  SR 0007; PT 1; T. 1.

cases)); *May v. Warden*, No. 07-CV-2176, 2010 WL 1904327, at *3 (S.D.N.Y. May 10, 2010) (dismissing habeas claim that prosecutor knowingly presented false evidence to grand jury); *Bingham v. Duncan*, No. 01-CV-1371, 2003 WL 21360084, at *4 (S.D.N.Y. June 12, 2003) ("[C]laims of error relating to state grand jury proceedings are not cognizable on federal habeas review, since '[t]he right to testify before a grand jury is a state statutory right, and is not of constitutional dimension.'" (quoting *Green v. Artuz*, 990 F. Supp. 267, 273 (S.D.N.Y. 1998)).

Additionally, even if this claim was cognizable on federal habeas review, the record makes clear that counsel raised a concern about Petitioner's placement in shackles before Petitioner entered the grand jury room, and asked that the shackles be removed or, if that could not be done, that the prosecution make no reference to the shackling.  SR 0044.  In response, the prosecutor advised counsel that the decision to handcuff Petitioner had been made by the court deputies, and that he would not make reference to the shackling.  *Id.*; SR 0189-90, 0399, 0435.  In other words, counsel made a strategic decision regarding how to handle Petitioner's shackling, which was not objectively unreasonable under the circumstances.  *See Martinez v. Colvin*, No. 17-CV-0757, 2018 WL 7047148, at *11 (S.D.N.Y. Nov. 6, 2018) ("The law recognizes a presumption that counsel makes reasonable strategic decisions.").

Furthermore, any failure of trial counsel to raise this issue with the trial court after the indictment was returned was not a violation of Petitioner's constitutional rights because (1) as noted by the Fourth Department, "[t]he 'overwhelming nature of the evidence adduced before the grand jury eliminated the possibility that [Petitioner] was prejudiced as a result of [any] improper shackling[,]'" *Young*, 153 A.D.3d at 1621 (quoting *People v. Brooks*, 140

27

A.D.3d 1780, 1781 (4th Dept 2016)), and (2) Petitioner was subsequently found guilty beyond a reasonable doubt by a petit jury.

Petitioner's ineffective assistance claim on this basis is therefore denied and dismissed.

### C.   Ground Two - Prosecutorial Misconduct Claim

Petitioner argues that the prosecutor engaged in misconduct by doing the following: (1) indicating during his opening statement that Petitioner told police to "prove it" while being questioned about Pagan's murder; (2) allowing Z.F. to present false testimony; (3) introducing suppressed statements during trial; and (4) attempting to shift the burden of proof to Petitioner and making inflammatory and denigrating remarks about Petitioner and defense counsel during his summation.  Pet. at 7, 33-34.

Respondent argues that Petitioner's prosecutorial misconduct claims are partially procedurally barred by the independent-and-adequate-state-ground doctrine, and wholly meritless.  R. Mem. at 18-26.  The Court agrees.

### 1. Procedural Bar

As noted by Respondent, the Appellate Division ruled that Petitioner failed to preserve, with contemporaneous objections, his claim that the prosecutor made improper remarks during his opening statement.  *See* Resp. Mem. at 18 (citing SR 0447).[12]

Federal habeas review of a state court decision is prohibited if the state court rested its judgment on adequate and independent state grounds.  *Harris v. Reed*, 489 U.S. 255, 261-62 (1989); *Cotto v. Herbert*, 331 F.3d 217, 239-40 (2d Cir. 2003).  "[T]his rule applies

---

[12]  The Appellate Division also ruled that Petitioner failed to preserve his claim that the prosecutor violated the trial court's suppression order, *see Young,* 153 A.D.3d at 1620, but that ruling was incorrect.  *See* T. 423-28.

28

whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). If the state court "explicitly invokes a state procedural bar rule as a separate basis for decision," a federal court is precluded from considering the merits of federal claims in a habeas petition. *Harris*, 489 U.S. at 264 n. 10; *see Fama v. Comm'r of Corr. Servs*., 235 F.3d 804, 809 (2d Cir. 2000) (In order for federal review to be barred, "[t]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" (quoting *Harris*, 489 U.S. at 261-62)).

In ruling that Petitioner failed to preserve his claim that the prosecutor made improper remarks during his opening statement, the Appellate Division applied New York's contemporaneous objection rule, N.Y. C.P.L. § 470.05(2). This rule provides that a question of law is properly presented to the appellate courts when "a protest thereto was registered, by the party claiming error, at the time of such ruling . . . or at any subsequent time when the court had an opportunity of effectively changing the same." CPL § 470.05(2). The Second Circuit has held that "the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011), *cert. denied* 132 S. Ct. 2439 (2012); *see also Romero v. Sheahan*, No. 13-CV-4048, 2016 WL 3460372, at *9 (E.D.N.Y. June 21, 2016) (declining to reach merits of claim that sentence was "punishment for [petitioner] having exercised his constitutional right to a jury trial" where petitioner failed to preserve it in state court). Since the Appellate Division relied on the contemporaneous objection rule when it denied Petitioner's claim that the prosecutor engaged in misconduct during his opening statement, and nothing in the record suggests that the invocation of the preservation rule was exorbitant, federal habeas review of the claim is barred by an adequate and independent state court ground. *See Hamilton v. Lee*, 707 Fed.

App'x 12, 14 (2d Cir. 2017) (summary order) ("'[T]here is no question that the claimed procedural bar,' the failure to comply with New York's contemporaneous objection rule, 'constitutes an 'independent' state ground of decision.") (quoting *Cotto*, 331 F.3d at 239); *Garcia v. Lewis*, 188 F.3d 71, 77, 82 (2d Cir. 1999) ("[T]he Appellate Division['s] rul[ing] that [the petitioner] failed to preserve his public trial claim for appellate review" constituted "an independent and adequate state ground of decision that precludes federal habeas review.").

Petitioner can avoid this procedural bar by showing cause for the default and resulting prejudice, or that the failure to review the claim will result in a miscarriage of justice, i.e., that he is actually innocent. *House v. Bell*, 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995). To establish cause, a petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman,* 501 U.S. at 753. If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Petitioner alleges no cause for his procedural default. Indeed, he does not even acknowledge the default. Accordingly, this Court need not decide whether he suffered actual prejudice. *Murray*, 477 U.S. at 496.

However, even assuming Petitioner could demonstrate cause, he would be unable to establish that he suffered actual prejudice because his prosecutorial misconduct claim based on remarks made during opening statements is meritless (as discussed in Section IV.C.2

below).

   In addition, Petitioner has failed to present any evidence that he is "actually innocent" of the crimes for which he was convicted. *House,* 547 U.S. at 536-39; *Schlup,* 513 U.S. at 327. Rather, he merely challenges the sufficiency of the evidence at trial in his Petition and Traverse. Thus, there is no basis to review the merits of Petitioner's procedurally barred prosecutorial misconduct claim under the "miscarriage of justice" exception. *See Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) ("Actual innocence is not in issue here; so cause and prejudice analysis is the only route to the merits."); *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("The miscarriage of justice exception is concerned with actual . . . innocence."); *Schlup*, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."); *Calderon v. Perez*, No. 10-CV-2562, 2011 WL 293709, at *21 (S.D.N.Y. Jan. 28, 2011) (Petitioner fails to meet *Schlup* burden when he "essentially relies on his legal sufficiency claim" and "fails to provide any new evidence to support his actual innocence claim.").

   Based on the foregoing, Petitioner's prosecutorial misconduct claim based on remarks made by the prosecutor during his opening statement is procedurally barred.

### 2. Merits

   As noted, Petitioner argues that the prosecutor engaged in misconduct by doing the following: (1) indicating that Petitioner told police to "prove it" during his opening statement; (2) allowing Z.F. to present false testimony; (3) introducing suppressed statements during trial; and (4) attempting to shift the burden of proof to Petitioner and making inflammatory

31

and denigrating remarks about Petitioner and defense counsel during his summation.  Pet. at 7, 33-34.

In addition to ruling that the alleged misconduct that occurred during the prosecution's opening statement was not preserved, the Appellate Division rejected as meritless both this aspect of Petitioner's prosecutorial misconduct claim, as well as Petitioner's prosecutorial misconduct claim based on the prosecution's alleged violation of the trial court's suppression order.  *See Young*, 153 A.D.3d at 1620.  The Appellate Division also found that although the prosecutor engaged in misconduct during his summation, Petitioner was not deprived of a fair trial as a result.  *Id*.  Furthermore, in denying Petitioner's 440 Motion, the trial court rejected Petitioner's contention that the prosecutor introduced perjured testimony at trial.  SR 0191.  Because these rulings were neither contrary to, nor unreasonable applications of, clearly established Supreme Court law, Petitioner's prosecutorial misconduct claim fails under AEDPA as discussed more fully below.

### a. Alleged Improper Remarks During Opening Statement

Petitioner claims that the prosecutor engaged in misconduct during his opening statement when he advised the jury that Petitioner told police on the day of his arrest to "prove it," that is, prove that he stabbed Pagan.  *See* Pet. at 7, 33-34; T. 252-53, 258.  Even if this claim were not procedurally barred from federal habeas review, which it is, the Appellate Division ruled that the prosecutor committed no misconduct during his opening statement.  *See* SR 0454.  That ruling was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

Petitioner's statement to the police about the strength of the proof against him was ruled admissible prior to trial.  SR 0329-34.  The prosecutor's "prove it" remark described the

evidence that the jurors were going to hear when he played the videotape of Petitioner's interview with the police.  *See* T. 418-24 (playing videotape). *See also Boyton v. Phillips*, No. 03-CV-1466 (JFB), 2006 WL 941793, at *8 (E.D.N.Y. Apr. 12, 2006) (the prosecutor's opening statement did not infect the trial with unfairness where she "merely provided a preview of her case and the evidence that was to be set forth at trial").

Accordingly, Petitioner is not entitled to habeas relief on the basis of the prosecutor's remarks during his opening statement.

### b.  Alleged Introduction of False Testimony

Petitioner claims that the prosecutor knowingly introduced false testimony at trial from eleven-year-old Z.F.  Pet. at 27-28, 34.  In denying Petitioner's 440 Motion, the trial court found that this claim was meritless, noting that Petitioner "ha[d] not provided the Court with any basis upon which to conclude that the People knowingly presented false testimony at trial[.]"  SR 0191.  That ruling was certainly not contrary to, or an unreasonable application of, federal law.

As an initial matter, the discrepancy identified by Petitioner with respect to Z.F.'s statement to the police on the day of the murder and his testimony at trial does not render Z.F.'s trial testimony false.  Indeed, there is not even an inconsistency between describing an item of material on one occasion as "brown/tanish" and on another occasion as looking like "a pair of socks balled up."  *Compare* T. 277 with SR 0110.  One description relates to the color of the object, and the other relates to the shape of the object.

Furthermore, to establish a wrongful conviction based on perjured testimony, a petitioner must show that "(1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is a[ ] reasonable likelihood that the false testimony could have affected the

judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (footnote omitted; quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).  In this case, Petitioner has failed to establish that the prosecutor (1) knew that Z.F. did not believe that the item he saw in Petitioner's back pocket on the day of the murder looked like a "pair of socks balled up," and (2) nonetheless allowed Z.F. to offer this testimony.  Petitioner has also failed to establish that Z.F.'s testimony regarding the item he saw in Petitioner's back pocket affected the judgment against him, which he of course cannot establish because Z.F. was not the only witness who placed Petitioner at the scene of the crime after Pagan was stabbed and before she died.

For these reasons, Petitioner is not entitled to habeas relief on the basis of the prosecutor's introduction of, and failure to correct, Z.F.'s testimony.

### c. Alleged Violation of the Suppression Order

Petitioner claims that the prosecutor violated the suppression order because, when he played the videotape of Petitioner's conversation with the police to the jury, he allowed the recording to run until the time index read twenty seconds past 6:38 p.m.  *See* Pet. at 34. The Appellate Division found that this "did not violate the [trial] court's suppression ruling." SR 0447.  This Court agrees with that factual finding, which also must be presumed correct on habeas review.  *See* 28 U.S.C. § 2254(e)(1).

In its pretrial Decision and Order on Petitioner's motion to suppress his statements to the police, the trial court specifically quoted the statement that Petitioner made during his police interview that constituted, in the court's view, an exercise of his right to remain silent, and noted that this statement occurred at "approximately 6:38:34 p.m."  *See* SR 0329-30. Later in that same Decision and Order, the trial court expressly found that Petitioner "invoked

34

his right to silence at approximately 6:38 p.m.[,]" after which it again quoted the statement that occurred at "approximately 6:38:34 p.m." before ruling that "all statements" taken after Petitioner invoked his right to silence "at approximately 6:38 p.m." were suppressed.  SR 0333.

At trial, the prosecutor stopped the recording of Petitioner's police interview several seconds before Petitioner invoked his right to silence.  *See* T. 423-28.  Thus, the prosecutor's conduct with respect to playing the recording of Petitioner's police interview did not violate the trial court's suppression order, or Petitioner's constitutional rights.  Accordingly, Petitioner is not entitled to habeas relief on the basis of the prosecutor's conduct with respect to playing the recording of Petitioner's police interview

### d.  Alleged Improper Remarks During Summation

Petitioner claims that the prosecutor engaged in two separate acts of misconduct during his summation, which improperly shifted the burden of proof to, and denigrated, the defense.  Pet at 7, 33-34.

"As a general matter, the Supreme Court has stated that prosecutorial comments constitute a constitutional violation only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Summa v. Plescia*, No. 07-CV-4668, 2008 WL 1818794, at *8 (E.D.N.Y. Apr. 22, 2008) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "The threshold question is whether the comments were improper."  *Id*.  "This determination must be made by considering the cumulative effect of the comments as a whole, *see, e.g., Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990), in the context of the entire trial."  *Id*. (citing *Donnelly*, 416 U.S. at 643; *Miranda v. Bennett*, 322 F.3d 171, 181 (2d Cir. 2003) ("The merits of a fair trial claim will depend on the likely impact of the misconduct

in light of the trial proceedings as a whole.")).

"If the comments at issue are improper the court must determine whether the challenged remarks 'were so prejudicial that they rendered the trial in question fundamentally unfair.'"  *Summa*, 2008 WL 1818794, at *8 (quoting *Floyd*, 907 F.2d at 353 (quoting *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986)).  "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted); *see also United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (noting that typically, "[r]emarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct" (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks omitted))).

In collateral attacks on state court convictions, as on direct appeal, the Second Circuit considers the following three factors in assessing whether the challenged comments created "substantial prejudice": (1) "the severity of the misconduct;" (2) "the measures adopted to cure the misconduct;" and (3) "the certainty of conviction absent the improper statements." *Floyd*, 907 F.2d at 355 (internal quotation marks and citation omitted).

### (i)  Burden-Shifting Comment

Petitioner contends that the prosecutor improperly shifted the burden of proof to the defense when he stated as follows: "Did [defense counsel] offer an explanation for why Johanna Pagan's blood is on the back of the elbow of the shirt that [Petitioner] stashed at The Art Store?"  Pet. at 7, 33-34; T. 606.

While the Court agrees with the Appellate Division that this comment was

36

inappropriate, immediately after it was made, defense counsel objected, and the trial court instructed the jury as follows: "[T]he defendant does not have a burden of proof in this case. I will remind you of that fact, and also remind you what the lawyers have said and will say during their closing arguments are not evidence. You have heard the evidence."  T. 606-07. The trial court then reiterated this burden of proof in its final charge to the jury, stating as follows:

> The accused is not required to prove that he is not guilty. In fact, the accused is not required to prove or disprove anything. To the contrary, the People have the burden of proving the accused guilty beyond a reasonable doubt. That means before you can find the accused guilty of a crime, the People must prove beyond a reasonable doubt every element of the crime, including that the accused is the person who committed that crime. The burden of proof never shifts from the People to the accused.

T. 649.

In light of the brief and isolated nature of the prosecutor's comment, the curative measures taken by the trial court,[13] and the overwhelming evidence of Petitioner's guilt, the prosecutor's comment was not so prejudicial that it rendered the trial fundamentally unfair. Thus, the Appellate Division's denial of the aspect of Petitioner's appeal based upon the prosecution's burden-shifting comment was neither contrary to, nor represented an unreasonable application of, clearly established Supreme Court precedent.

### (ii)  Denigration of the Defense

Petitioner contends that the prosecutor denigrated the defense and defense counsel with the following remarks:

> [Defense counsel] also proposed a series of questions about why would

---

[13]  The Court must assume, based on the absence of evidence to the contrary, that the jury followed the trial court's instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").

somebody who had just committed a heinous crime run down the middle of the street. Why wouldn't they hide in the yards. Why would somebody -- just why wouldn't they drop the glove, right? Why would he keep that glove in his pocket at The Art Store if he had just committed this heinous crime. Well, the assumption is that people who end up in criminal trouble are smart enough to get out of it. Right? They make completely rationale decisions so they wouldn't make mistakes. If they were really smart, they wouldn't be here. People make mistakes in the middle of horrific mistakes. They don't always make logical decisions. Probably have been better for the defendant to run through the backyards or hide under a porch somewhere. He didn't do that. So he was caught and now he is here. He's here on two charges. (T. 607)

. . .

I saw this very cute chart [defense counsel] put together, and my immediate thought as he was going through it was this is why people hate lawyers, right? . . . . Take your definitions about the law from Judge Miller, not this stupid chart.  (T. 608-09)

. . .

And here's my favorite part [of Petitioner's grand jury testimony], I hope they find the person that did this. . . . after 75 or 80 words that's what he's got to say, and then he says, I don't know what else to say. I don't know what else to say. Seriously?

Like you're in jail for murder, something you didn't do. Right? You didn't do it. This friend of yours is filleted, brutally, blood everywhere, this friend of yours, you saw it, you came upon it, you're the first one, and you ran, panicked and ran, and then they thought you did it, and they arrested you, and you sat in jail for a month, and after 75 words, when you finally get the chance to explain yourself you run out of things to say. Are you kidding me[?] Does that make any sense at all? No. (T. 627-28)

. . .

[Petitioner] tells him this story and George says, man, if you want me to help you, you have to tell the truth. Right? So he's got to change this story. The one he told the police isn't going to fly. So how does he explain why he didn't tell this story the first time to the police. Xanax. The Xanax defense. The, oops, I forgot to tell the truth drugs. (T. 629)

. . .

> Takes him three pages before he even starts to tell his story. It's ridiculous. It's false. (T.631)
>
> . . .
>
> When a defendant, when someone facing criminal charges decides, makes a decision, a conscious decision to waive [his] right [to remain silent] and give an account this makes your job easier. Because the only reason somebody who is facing criminal charges says something that isn't absolutely forthcoming, the reason they do that is that they're guilty. They're guilty. There is no other explanation. (T. 635-36)

The Appellate Division ruled that the above remarks, while improper, were not so egregious as to deny Petitioner a fair trial. *Young*, 153 A.D.3d 1620. This Court agrees.

The majority of the aforementioned remarks related to the evidence in the case – specifically, Petitioner's flight from the crime scene, statements to the police, and grand jury testimony. As the Second Circuit has held, "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (citation and internal brackets omitted).

Moreover, with respect to the prosecutor's denigrating remarks regarding Petitioner's intelligence, and defense counsel's visual aid and defense theory, there can be no doubt that "[i]t is improper as a matter of both state and federal law for a prosecutor to impugn defense counsel's integrity, denigrate or ridicule the defense theory, or make ad hominem attacks on defense counsel." *Norcutt v. Miller*, No. 9:15-CV-0221 (JKS), 2016 WL 7429440, at *9 (N.D.N.Y. Dec. 23, 2016). However, as noted above, prosecutorial misconduct of this nature results in a constitutional error only when the remarks were so prejudicial that they rendered the trial in question fundamentally unfair. *See Darden*, 477 U.S. at 181; *Summa*, 2008 WL 1818794, at *8.

Before defense counsel and the prosecution began their summations, the trial court

issued pre-summation instructions to the jury, which included the following charge:

> If you find that the evidence as summed up and analyzed by the attorney is accurate, and if you find that the inferences and conclusions which you're asked to draw from such evidence are reasonable, are logical and consistent with the evidence, then you may adopt such inferences and conclusions.
>
> But bear in mind the following points. First, you are the finders of the facts, and it's for you and you alone to determine the facts from the evidence which you find to be truthful and accurate.
>
> Secondly, remember that the lawyers are not witnesses in this case. So if a lawyer asserts as fact something that is not based on the evidence, you must disregard that. Remember, nothing that the lawyers say at any time is evidence. So nothing the lawyers say in their summations is evidence. You have heard the evidence, and you must decide this case on the evidence and on the law as I will explain it to you later today.
>
> Thirdly, during the summations, one lawyer's recollection of the evidence may in good faith differ with the recollection of the other or with yours, and the lawyers I'm sure will undoubtedly differ with each other on their understanding and their evaluation of the facts that have been presented by the evidence. It is your own recollection, your own understanding and your evaluation of the evidence which controls, regardless of what the lawyers have said or will say about the evidence. Remember also under our law I'm responsible for setting forth the law, not the lawyers.

T. 563-64.

Then, following the close of the prosecutor's summation, the trial court included the following statement in its charge to the jury:

> [A]rguments of the attorneys made during the course of the trial are not evidence and must also be disregarded by you. Each of these lawyers is an officer of the court owing a high duty to his or her client. Their function is to represent their client to best of their ability. If in the interest of advocacy the lawyer did or said something which you feel as though was objectionable, you must not let such feelings interfere with your primary duty to judge the facts impartially and to be fair to both the People and to the accused.

T. 647-48.

In light of these instructions, as well as the overwhelming evidence of Petitioner's guilt, there is no basis to conclude that the prosecution's summation remarks, even when viewed as a whole, were so prejudicial that they rendered the trial in question fundamentally unfair. *See Darden*, 477 U.S. at 181; *Fuentes v. Ebert*, No. 06-CV-5813, 2009 WL 1755500, at *16 (S.D.N.Y. June 22, 2009) ("When viewed in its entirety and in context, and in light of the trial court's instructions and strength of the prosecution's evidence, the prosecutor's summation in this case[, although inappropriate in parts,] did not so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process[,]" and "there is therefore no basis for this Court to find that the Appellate Division erred or unreasonably applied the law, habeas relief on this claim would not be warranted." (citing, *inter alia*, *Player v. Artus*, No. 06-CV-2764, 2007 WL 708793, at *10 (E.D.N.Y. Mar. 6, 2007) (although the "prosecutor's comments were at times unnecessarily inflammatory," any injurious effect was ameliorated by the court's instructions and, in any event, comments were "not so egregious as to support a finding that the Appellate division's rejection of this claim was an unreasonable application of clearly established federal law"))); *Warren v. Ercole*, No. 07-CV-3175, 2007 WL 4224642, at *8 (E.D.N.Y. Nov. 27, 2007) (finding prosecutor's comments on summation did not deprive the petitioner of a fair trial and "given the overwhelming evidence of guilt, even if those statements were inappropriate, they would not warrant a grant of habeas relief because they did not have a substantial and injurious effect or influence on the jury's verdicts").  Thus, the Appellate Division's denial of the aspect of Petitioner's appeal based upon the prosecution's denigrating remarks was neither contrary to, nor represented an unreasonable application of, clearly established Supreme Court precedent.

Ground Two of the Petition is therefore denied and dismissed.

41

### D.   Ground Three - *Batson* claim

Petitioner argues that the trial court erred in denying his claim that the prosecutor's use of a peremptory challenge to strike an African-American juror violated his rights to equal protection under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Pet. at 8, 34-35.

Respondent argues that Petitioner's *Batson* claim is wholly meritless.  R. Mem. at 26-30.  The Court agrees.

Racial discrimination in the jury selection process violates the Equal Protection Clause.  *Batson*, 476 U.S. at 85.  Under the three-step *Batson* analysis, once a party has objected to a peremptory strike and established a prima facie case of racial discrimination, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation."  *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam); *Batson*, 476 U.S. at 96-98.  The race-neutral explanation does not have to be "persuasive, or even plausible," as long as the explanation is not discriminatory on its face.  *Purkett*, 514 U.S. at 768 (citing *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).  "[T]he third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances."  *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000) (internal quotation and citation omitted); *Hernandez*, 500 U.S. at 363-64; *Batson*, 476 U.S. at 98.  Trial courts applying the third *Batson* prong are not required to recite any particular words, but must make clear whether they credit "the non-moving party's race-neutral explanation for striking the relevant panelist."  *Messiah*, 435 F.3d at 198.

A trial court's determination of whether a peremptory challenge resulted from purposeful discrimination is a finding of fact based primarily on an assessment of credibility, and is therefore entitled to significant deference.  *Felkner*, 131 S. Ct. at 1307; *Purkett*, 514

U.S. at 769; *Batson*, 476 U.S. at 98 n.21; *see Hernandez*, 500 U.S. at 365 (treating discriminatory intent as a finding of fact makes "particular sense" because the trial court can best assess the credibility of the prosecutor).  The trial court's determination "must be sustained unless it is clearly erroneous." *Felkner*, 131 S. Ct. at 1307 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

Here, Petitioner's trial counsel raised a *Batson* challenge, arguing that the prosecutor's use of the peremptory strike for juror number four, an African American woman, demonstrated purposeful discrimination.  T. 122.  In an effort to establish a prima facie case of discrimination, defense counsel noted that there were only two African Americans in the jury pool comprised of about sixty people, one was excused due to expressed difficulty with impartiality, and the only remaining African American – juror number four – had not "said anything . . . that would warrant her rejection as a juror."  T. 123.

In response, the prosecutor objected to the challenge on the grounds that defense counsel failed to establish a prima facie case because "one person is not a pattern."  T. 124. Notwithstanding this objection, the prosecutor then offered the following explanation for his use of the peremptory strike for juror number four: "the reason I'm challenging Miss Williams is based on her education background, the early childhood education background to me is indicative of a person who wants to see the best in everyone and has a difficult time judging people."  T. 125.  After hearing from the attorneys, the trial court found that Petitioner had not made a prima facie case under *Batson*, noting as follows: "in light of the fact that this is the first African-American juror that has been challenged, I do not see any type of pattern at this point so I'm going to deny the *Batson* challenge."  *Id*.

The Appellate Division agreed with the trial court's conclusion, ruling that "[Petitioner]

43

failed to meet his burden of making out a prima facie case of purposeful discrimination with respect to the prosecutor's exercise of a peremptory challenge to a black prospective juror inasmuch as he failed to articulate any facts or circumstances that would raise an inference that the prosecutor excused the prospective juror for an impermissible reason[.]" *Young*, 153 A.D.3d 1620 (internal quotation marks and citation omitted).  That finding was "fairly supported and cannot be deemed inherently 'unreasonable,' under AEDPA § 2254(d)(2)." *Baker v. Bennett*, 235 F. Supp. 2d 298, 311 (S.D.N.Y. 2002); *see also Rice v. Collins*, 546 U.S. 333, 341 (2006) (the fact that "the prosecutor claimed to hold . . . concerns despite [the challenged panelist's] *voir dire* averments does not establish that [the prosecutor] offered a pretext."); *Messiah v. Duncan,* 435 F.3d 186, 200 (2d Cir. 2006) (finding nothing inappropriate about striking a social service professional who might have sympathy for the defendant); *Isaac v. Brown*, 205 Fed. App'x 873, 876-77 (2d Cir. 2006) (finding no prima facie showing of discrimination where the prosecutor struck an African American juror who believed that his brother had been "falsely accused of a crime"); *McCall v. Rivera*, 965 F. Supp. 2d 311, 328 (S.D.N.Y. 2013) ("Petitioner has failed to show that the trial court's decision to accept the prosecutor's explanation with regard to the juror's lack of eye-contact was contrary to or involved an unreasonable application of *Batson* and its progeny."); *Welch v. Burge*, No. 9:03-CV-01423 (LEK/VEB), 2007 WL 2028048, at *4 (N.D.N.Y. July 12, 2007) (accepting, as non-pretextual, prosecutor's explanation that he struck prospective juror because of, among other things, her "religious affiliation"); *DeBerry v. Portuondo*, 277 F. Supp. 2d 150, 159-60 (E.D.N.Y. 2003) (trial court properly accepted prosecutor's explanation that he struck a prospective juror because of her "stubborn" and "intractable" demeanor), *aff'd on other grounds*, 403 F.3d 57 (2d Cir. 2005); *Copeland v. Walker*, 258 F. Supp. 2d

44

105, 127 (E.D.N.Y. 2003) (challenged jurors "were legal secretaries who may have claimed

greater knowledge of the legal system than other members of the jury."); *Giles v. Kuhlmann*,

No. 1:98-CV-7368, 2002 WL 1751401, at *5, *7 (E.D.N.Y. July 11, 2002) (denying habeas

petition and upholding peremptory challenge based on, among other factors, the juror's "poor

rapport and bad eye contact with" the prosecutor and that the juror worked for a lawyer).

     Accordingly, Ground Three of the Petition is denied and dismissed.

## V.    CONCLUSION

     **WHEREFORE**, it is hereby

     **ORDERED** that the Petition (Dkt. No. 1) is **DENIED AND DISMISSED IN ITS

ENTIRETY**; and it is further

     **ORDERED** that no Certificate of Appealability ("COA") shall issue because Petitioner

failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. §

2253(c)(2) requires;[14] and it is further

     **ORDERED** that any further request for a Certificate of Appealability must be

addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

     **ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in

accordance with the Local Rules.

Dated: September 14, 2021
      Binghamton, NY

Thomas J. McAvoy
Senior, U.S. District Judge

---

[14] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).